IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **GERAWAN FARMING PARTNERS, INC., a California Corporation,** | ) ) | **CIV F 05-1186  AWI DLB** |
| | ) | **ORDER ON DEFENDANTS'** |
| **Plaintiff**, | ) | **MOTIONS FOR SUMMARY** |
| **v.** | ) | **JUDGMENT** |
| | ) | |
| **WESTCHESTER SURPLUS LINES** | ) | |
| **INSURANCE COMPANY, ARCH** | ) | (Doc. Nos. 45, 63) |
| **SPECIALTY INSURANCE COMPANY,** | ) | |
| **ROYAL SURPLUS LINES INSURANCE** | ) | |
| **COMPANY, and DOES 1 through 100,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

      This is an insurance dispute between Plaintiff Gerawan Farming Partners, Inc.

("Gerawan") and Defendants Westchester Surplus Lines Insurance Co. ("Westchester"), Arch

Specialty Insurance Co. ("Arch"), and Royal Surplus Lines Co. ("Royal").  Westchester is the

primary insurer of Gerawan and Arch and Royal are Gerawan's excess insurers.  Gerawan

brought this suit in state court and alleged breach of contract and bad faith.  Westchester removed

the case to this Court and now moves, along with Arch and Royal, for summary judgment.  For

the reasons that follows, all motions for summary judgment will be denied.

1                              **FACTUAL BACKGROUND**[1]

2          Gerawan owns, grows, packs, and processes stone fruit, such as nectarines, around

3   Reedley, California.  See PUMF No. 1; DUMF No. 2.  Westchester issued a commercial property

4   policy of insurance ("the Policy") to Gerawan for the period of October 2002 to October 2003,

5   with $2.5 million in primary coverage.  See PUMF No. 2; DUMF No. 1; AUMF No. 2.  There is

6   no dispute that the Policy is an "all risks" policy.  Arch and Royal each issued excess first party

7   insurance policies to Gerawan for the period of October 1, 2002, to October 1, 2003, with a total

8   of $7.5 million in excess coverage.  AUMF Nos. 3-4, 7-8.  The Arch and Royal excess policies

9   incorporate the same conditions and exclusions as the Policy.  See AUMF Nos. 5-6, 9.

10         In August 2003, Gerawan became aware that a number of its nectarines were suffering

11  from a condition referred to as "pitting."  PUMF No. 3; DUMF No. 3.  Pitting is a cosmetic

12  problem that affects the surface of the fruit and is characterized by multiple small craters on the

13  surface of the nectarine.  PUMF No. 4.  The pits can vary in size and can cause moderate to

14  severe discoloration.  DUMF No. 33.  Pitting of nectarines is not uncommon, however, there was

15  an explosion of nectarine pitting in 2003 that far exceeded pitting that had occurred in prior

16  years.  PUMF No. 5.[2]  The pitting was not visible or evident while the nectarines were growing

17  on the trees and only became apparent after the fruit went through the post harvest handling.

18  PUMF No. 68.  Gerawan reported that it first learned of the damage when its customers

19  complained of the nectarine's appearance.  DUMF No. 35.

20         Gerawan notified Westchester of the loss about August 19, 2003, and Westchester

21  acknowledged receipt of the claim on August 21, 2003.[3]  See PUMF No. 6; see also DUMF No.

22  ─────────────────

23         [1]As used in this Order, "PUMF" refers to Plaintiff's Undisputed Material Facts.  "DUMF" refers to
    Westchester's Undisputed Material Facts.  "WPUMF" refers to Westchester's Response to Plaintiff's Undisputed
24  Material Facts.  "AUMF" refers to Arch and Royal's Undisputed Material Facts.

25         [2]Westchester objects to the PUMF "to the extent that 'explosion' is vague and ambiguous.  In context, the
    term "explosion" clearly means abnormally excessive.  The objection is overruled.

26         [3]Gerawan gave Arch and Royal notice of the claim on November 17, 2004, more than one year after giving
27  notice to Westchester.  See AUMF No. 13-14.  The loss reported to Arch and Royal was six weeks after Gerawan
    had provided the damage amount documentation to Westchester, which totaled $4.9 million.  See PUMF Regarding
28  Arch & Royal Nos. 82, 87.  Due to Gerawan's tardy notice, Arch and Royal utilized the same adjusting resources as
    Westchester, including the adjuster, agricultural expert, and coverage counsel.  See AUMF No. 15.

4. The claim was assigned to adjuster John Adair in Atlanta, Georgia. PUMF No. 7. One day later, Adair assigned Kurt Neupert of GAB Robins North America, Inc., who was located in Fresno, to act as the field adjuster. PUMF Nos. 8-9; DUMF No. 47. Neupert visited and inspected Gerawan's Reedley facility on August 25, 2003, spoke with Gerawan personnel about the pitting, and inquired into the general process that the nectarines underwent from the trees to the point of sale. PUMF Nos. 10-11; see also DUMF Nos. 48-51. Gerawan employee Tony Martinez told Neupert that Gerawan had not changed its packing operations since 1996, there had been no problems with the machinery or dump system or packing equipment prior to discovery of the pitting, and that Gerawan had been unable to determine the cause of loss. DUMF Nos. 52-55. Neupert was unable to ascertain the cause of the pitting and was given authority by Westchester to retain an expert. PUMF No. 13; see also DUMF Nos. 56-58. Neupert cannot recall making any other visits to Gerawan's facility. See WPUMF No. 14.

Gerawan was also actively investigating the pitting in August 2003 in order to determine the cause. PUMF No. 12. Gerawan employee George Nikolich was actively investigating the cause of the pitting and had conducted/was conducting multiple experiments in order to determine the cause. PUMF No. 17. Despite attempting to isolate the cause of the pitting, Nikolich was unable to find any correlation between the post harvest techniques and the handling of the nectarines and the pitting. PUMF No. 18. The trials conducted by Nikolich indicated that the nectarines that were picked and then packed, bypassing treatment and processing, had virtually no pitting. See Gerawan Exhibit U at p. 1 ¶ 3(a); First Report; see also Second Report; Third Report.[4]

On September 15, 2003, Westchester retained Dr. Julian Whaley, a local forensic

---

[4]Dr. Julian Whaley authored four reports in connection with Westchester's investigation of the nectarine pitting. DUMF No. 11. The dates of the reports are December 3, 2003, January 5, 2004, December 6, 2004, and April 18, 2005. These reports are Westchester Exhibits F, G, H, and I, respectively. The December 3 report will be referred to as "First Report," the January 5 report will be referred to as "Second Report," the December 6 report will be referred to as "Third Report," and the April 15 report will be referred to as "Fourth Report."

Additionally, Westchester and Arch and Royal have submitted a number of proposed Undisputed Facts that characterize Dr. Whaley's findings and rely upon Dr. Whaley's reports. Given Gerawan's position and the Defendants's reliance on Dr. Whaley's reports, the Court will reproduce the key portions of Dr. Whaley's report instead of relying on any party's proposed undisputed facts that characterize these reports.

1  agricultural expert, in order to determine the cause of the pitting.[5]  PUMF No. 15; see also

2  DUMF No. 10.  Dr. Whaley met with Nikolich on September 17, 2003.  PUMF No. 16.  Nikolich

3  discussed his investigations with Dr. Whaley and provided him with photographs of his

4  experiments.  PUMF No. 20.  With the assistance of Nikolich, Dr. Whaley set up additional

5  experiments in order to isolate and remove different steps along the packing line in order to

6  determine the cause of the pitting.  PUMF No. 21.  Gerawan inadvertently shipped the fruit that

7  was part of this experiment and Dr. Whaley set up a second experiment.[6]  See Nikolich

8  Declaration ¶ 18; First Report.

9        Following his investigation and experiments from September through December 2003,

10  Dr. Whaley authored the First Report.  PUMF No. 24.  The First Report states in relevant part:

11     One of the first questions to consider is why did the varieties [of nectarines] in
       question pit this year and not in previous years?  In our opinion, we believe that
12     environmental conditions for growing any crop are different each year.  We
       believe that the 2003 growing conditions somehow predisposed the fruit to pitting
13     when it passed over the packing line.  Of course fruit must be run over the packing
       line process [] and [treated] with waxes.  In other words, there was no way
14     [Gerawan] could bypass the packing line after picking. [Gerawan] has been
       growing [the nectarines] for approximately 10 years with no pitting problems.  It
15     is not a problem where symptoms show up in the field.  We could pack fruit
       directly in boxes from the picking buckets and put them in cold storage with no
16     symptom development.  Therefore the problem in the commercial picking and
       packing of the fruit came from somewhere on the packing line itself.
17
18     Another question is what structures on the fruit surface were involved in the
       pitting process.  Most of the pits seemed to be associated with lenticels (natural
19     pores for absorbing carbon dioxide).  Perhaps in the 2003 season, these structures
       were not strong on these . . . nectarines.
20            . . . . . . .
21     However, I did get to see that treatment {placing nectarines directly from the
       picking buckets into the packed boxes} in an experiment that Mr. Nikolich had
22     conducted. . . .  There was virtually no pitting if [the fruit] went directly from the
       field to the packed box.  This is important because it tells me that the pitting is not
23     something that develops directly in the field and expresses symptoms after some
       time in storage.  It is a problem with something on the line . . . .
24            . . . . .
25     In summary, we are of the opinion that the 2003 season predisposed the nectarines
       in question to pitting but was not the direct cause of the problem.  The waxing
26     operation actually protected the fruit from pitting as seen in our experiment.  The

27    _____
       [5]Arch and Royal also retained Dr. Whaley.  See AUMF 33.
28
       [6]The results of the second experiment are unknown to the Court.

4

> fact that we could pack fruit directly from the buckets and put in cold storage successfully showed us that the problem was caused by some mechanical operation on the packing line beyond the waxing section. . . .  Without the benefit of our experiment, which was lost, we cannot say which of the operations . . . caused the pitting.  It is obviously a situation where we had a very susceptible piece of fruit being mechanically rubbed during the packing operation and causing the pitting.  It should not be overlooked that the pitting could be reduced if the fruit were room cooled instead of forced air-cooling.  However, room cooling is not an acceptable way of handling the fruit before putting it in cold storage.

First Report.

Dr. Whaley's First Report does not identify what particular conditions or factors about the 2003 growing season predisposed the nectarines to pitting.  See PUMF No. 27; First Report.

Apparently while Dr. Whaley was working with Nikolich, Neupert authored a reservation of rights letter on November 7, 2003, and sent it to Gerawan.  PUMF No. 23; DUMF No. 59.  Upon receipt of the First Report, Neupert cannot recall following up with Dr. Whaley regarding the cause of the pitting at that point.  See Neupert Deposition at 74-75; see also PUMF No. 28; WPUMF No. 28.

On January 5, 2004, Dr. Whaley authored a second report, ostensibly to comment on Nikolich's written report entitled:  "Nectarine Pitting Trials . . . ."  PUMF No. 29.  The report is approximately 4 pages and mostly discusses 4 "trials" or experiments.  See Second Report.  In part, Dr. Whaley states:

> You must remember that this pitting problem begins in the field even though no symptoms are present to the naked eye.  Some years produce fruit that is more easily desiccated than other years.  It seems that this drying occurs mostly at [the] lenticels (pores), which cause collapse of cells around the pores.  Apparently a combination of mechanical stress and rapidly moving air during pre-cooling causes moisture loss.

> My report of December 3 summarizes our opinion on the cause of the pitting.  I think that the 2003 season resulted in the susceptible varieties being prone to dehydration from the lenticels and subsequent pitting.  Susceptible varieties would not pit if taken directly from the picking bucket to pre-cooling then cold storage or room cooling to cold storage.  Pitting could be somewhat reduced if room cooled but that is not a commercially acceptable practice.  One of the stations on the packing line induced pitting but we could not determine which station was mostly responsible because [Gerawan] mistakenly packed our experiment before we could make observations.  The main argument for mechanical damage is that the interior of the sutures is protected and has virtually no pitting.

Second Report.

Dr. Whaley's Second Report does not identify what particular conditions or factors about the

1  2003 growing season predisposed the nectarines to pitting.  <u>See</u> PUMF No. 32; Second Report.

2  Dr. Whaley conducted no further investigations regarding causation prior to Westchester's denial

3  of Gerawan's claim.  <u>See</u> PUMF No. 50.[7]

4      Dr. Whaley informed Neupert that, despite the loss of experiments through shipping, Dr.

5  Whaley was still able to reach a conclusion about the cause of the pitting.  <u>See</u> PUMF No. 33;

6  WPUMF No. 33.  In a fourth report to Westchester sent in January 2004, Neupert stated in part,

7  "From information gathered along the experiment process, [Dr.] Whaley was able to come to a

8  reasonable conclusion that the fruit was not affected from growing, chemicals, chlorine, washing,

9  certain aspects of the packing line, waxing, and cold storage."  PUMF No. 35.  Neupert did not

10  recall following up with Dr. Whaley after sending this report to Westchester.  <u>See</u> PUMF No. 36.

11  John Adair also received Dr. Whaley's First and Second Reports, yet he still had questions in his

12  mind about which factor exactly caused the pitting.  <u>See</u> PUMF Nos. 38, 40; WPUMF No. 40.

13  Adair did not contact Dr. Whaley, but asked Neupert to follow up with Dr. Whaley.  <u>See</u> PUMF

14  No. 41; WPUMF No. 41.

15      On January 24, 2004, Neupert sent Gerawan a letter stating that Westchester was

16  reviewing the report from [Dr. Whaley] to determine the cause of the loss and that once the

17  review was completed, Gerawan would be contacted regarding the claim.  PUMF No. 43.

18  Neupert requested documentation regarding the amount of Gerawan's damages by letters dated

19  May 22, 2004, and August 27, 2004, and also contacted Gerawan on March 10, 2004, and March

20  31, 2004.  <u>See</u> PUMF No. 51; Westchester Exhibits M, N, O; DUMF Nos. 61-64.[8]  On April 9,

21  2004, Gerawan notified Neupert that the preliminary damages exceeded $2.2 million and that the

[7]Dr. Whaley submitted a Third Report on December 6, 2004.  However, the report is entitled "Summary of Conclusions" and there is no indication that further investigation was done.  <u>See</u> Third Report.  Dr. Whaley also authored a Fourth report in which he researched post-2003 literature and an old case file.  However, there is no indication of investigation at Gerawan's facility, with the nectarines, or with Gerawan employees.

[8]DUMF Nos. 61 through 64 are undisputed and indicate that letters were sent to Gerawan requesting records to substantiate the claim for loss and damages.  The DUMF's are based on Westchester Exhibits M, N, and O, which are the letters sent to Gerawan from Neupert.  The letters are materially identical and seek "documentation and records that determine the amount and cost of the loss [and] information regarding the sale of the fruit for a lesser cost, or salvage."  Westchester Exhibits M, N, O.  Since "loss" can relate to causation, and since the basis for these DUMF's relate only to the dollar amount of damages suffered, to avoid possible confusion, the Court will treat DUMF Nos. 61-64 as relating only to requests for information regarding the amount of damages allegedly suffered.

damages were still being calculated.  PUMF No. 52.  On September 6, 2004, after the completion

of the harvest season, Gerawan submitted loss documentation to Neupert for the pitted nectarines

which totaled $4.9 million.  PUMF No. 53.  Gerawan submitted the information nearly six

months after Westchester had requested it and over one year after Gerawan had filed its claim.

DUMF Nos. 65-66.  The amount of loss documentation for 2003 was not submitted earlier since

Gerawan was in the midst of the 2004 season and compiling the losses for the 2003 season

simultaneously.  See PUMF No. 54.  Westchester turned the matter over to coverage counsel on

October 21, 2004 for a coverage opinion.  PUMF No. 55; DUMF No. 86.  Also, Westchester

reviewed the amount of loss documentation and sent the voluminous documents to an accountant

for analysis.  See DUMF No. 67.  Westchester was unable to analyze Gerawan's claim for

damages until after it received Gerawan's documentation.  DUMF No. 68.

Also, in the late summer/early fall of 2004, Adair took an 8-12 week disability leave, and

beginning on October 5, 2004, the claim was handled by Maggie Bukowczyk.  See PUMF No.

44; WPUMF No. 44.  Bukowzcyk did not discuss the file with Adair.  PUMF No. 45.

Bukowczyk testified that she believed that a coverage determination was not yet made since

Westchester was waiting for claim information from the insured, that is, documentation

regarding damages and how the claim or how the loss occurred.  See Bukowczyk Deposition at

40-41; see also PUMF No. 46; WPUMF No. 46.  Other than referring the claim to coverage

counsel, it appears that Bukowczyk did nothing to determine the cause of loss.  See PUMF No.

48; WPUMF No. 48.

On December 6, 2004, Whaley authored his Third Report, which summarized his two

prior reports.  PUMF No. 56.  The Third Report in part reads:

> . . . Apparently the 2003 season was one which predisposed three nectarine
> varieties to damage on the packing line.  This predisposition could not have been
> predicted.
>
> A very important fact to consider is that fruit picked into buckets and put in cold
> storage directly without pre-cooling (forced air cooling) and without going
> through the packing line was essentially free of damaging pits.  This means that
> some equipment on the packing line was responsible for the pitting symptoms.
> Fruit that was pre-cooled with forced air and directly put into cold storage
> developed more pitting symptoms compared to fruit going directly into cold
> storage without pre-cooling.  This bypassing of pre-cooling is not commercially

feasible because hot fruit will not cool properly if put directly into cold storage. . .

Pitting symptoms developed only on the flat surface of the fruit and not in protected indentations on the stem end or around the suture. This indicated to me that a mechanical problem as the fruit passed over some part of the packing line was involved in causing the pitting symptoms.

Third Report.

Dr. Whaley's Third Report does not identify what particular conditions or factors about the 2003 growing season predisposed the nectarines to pitting.  See PUMF No. 58; Third Report.

On December 17, 2004, nearly 16 months following the submission of the claim, Westchester denied the claim.  See PUMF No. 59.  The denial letter contended that the loss was excluded by approximately 14 exclusions.  See PUMF No. 61; DUMF No. 88.  Following the denial of the claim, Gerawan's attorneys corresponded with Westchester's coverage counsel on several occasions in an attempt to clarify the basis of the denial.  See PUMF No. 62.  After various communications between Westchester and Gerawan about the denial, Adair instructed Neupert to continue to develop the claim and address the issues of causation and coverage. DUMF No. 89.

Four months after the denial of coverage, Dr. Whaley authored a Fourth Report at Westchester's request.  PUMF No. 63; DUMF Nos. 90-91.  For the Fourth Report, Dr. Whaley reviewed available, recent literature, a closed case file, and the three prior reports.  See Fourth Report.  In the final paragraph of the two page report, Dr. Whaley concludes:

Based upon my investigation, I believe that the fruit was predisposed to pitting by growing conditions in the field in 2003.  The shrinkage of areas around the lenticels is probably related to desiccation and subsequent pitting.  When the fruit was passed over the packing line something triggered the pits to occur.  However, one packing house in 2000 reported pitting even though white fleshed peaches are not run across their packing line.  I do not know exactly what weather conditions existed in 2003 to cause the propensity to pitting by certain varieties but it was probably related to temperature and moisture.  I do not believe that anything applied to the fruit during the season or on the packing line caused the problem. There is no documented evidence that this problem was ever found in the field and therefore it is a post harvest problem in our opinion.

Fourth Report.

As part of Dr. Whaley's total investigation, he (1) visited Gerawan's facility on several occasions and inspected the affected nectarines; (2) closely inspected the packing line and

individual mechanisms within the packing line; (3) closely inspected the cold storage facility; (4) created experiments meant to isolate the cause of the loss; (5) spoke with Nikolich regarding Nikolich's experiments and reviewed Nikolich's report; (6) reviewed documentation regarding a previous investigation that he had conducted in 2000; and (7) researched available literature written about pitting since the 2003 loss.  DUMF No. 73.  Other than Dr. Whaley's Third and Fourth Reports, there appears to have been no further investigation regarding causation after the issuance of Dr. Whaley's Second Report.  See PUMF No. 50; WPUMF No. 50.

After reviewing the Fourth Report, on April 21, 2005, Westchester reiterated its denial of Gerawan's claim.  DUMF No. 95.  During the pendency of the investigation, Neupert sent Westchester 10 reports regarding the status of the investigation.  See PUMF No. 37; DUMF No. 69.  Since the Arch and Royal policies follow the terms, conditions, limitations, and exclusions of the Westchester Policy, Arch and Royal have declined Gerawan's claims on, among other things, the provisions, exclusions, and endorsements cited by Westchester.  AUMF Nos. 86-87.

*Expert Declarations Regarding the Cause of Pitting*

1.     Dr. Julian Whaley

In addition to Dr. Whaley's four reports, he submitted a declaration in support of Westchester's motion.  In relevant part, Dr. Whaley declares:

12.     Ultimately, my investigation revealed that Gerawan's nectarines were predisposed to pitting due to the growing conditions experienced in 2003.  These growing conditions produced susceptible varieties of nectarines that were prone to dehydration of the lenticels . . . .  The pitting of the fruit occurs when cells around the weakened lenticels collapse and form "pits" on the surface of the fruit. . . .

13.     From my investigation, I believe that the weakening of the lenticels occurred while the fruit was growing in the field even though no symptoms were present to the naked eye.  It is more likely that the change to the internal composition of the fruit occurred during the growing season.  My professional opinion is that the change was caused by a fluctuation of temperature and moisture.  Thus, at the time the nectarines were picked, the lenticels were already damaged and the nectarines were already prone to pitting.

14.     My investigation further revealed that the pitting symptoms . . . manifested themselves as the fruit passed through the packing line and was exposed to the cold air in the cold storage facility.  The weakened lenticels created nectarines that were ultrasensitive to the normal rigors of the packing line and to the normal temperatures used in the cold storage facility.  When the fruit was mechanically rubbed by the usual brushes and rollers used on the packing line, and then stored in the cold storage facility where moisture was drawn out of the fruit, the pitting

symptoms became visible to the human eye as the weakened lenticels collapsed
and created indentations on the outside surface of the skin.

15.     During my investigation, I did not find that anything applied to the fruit
(chemical, wax or otherwise) during the season or on the packing line caused the
pitting.  Moreover, my inspection of the packing line revealed that it was working
properly and that there was no mechanical malfunction or breakdown. . . .

Whaley Declaration at ¶¶ 12-15.

2.     Dr. Dale Rush

Dr. Rush, a forensic agronomist, was retained by Westchester in 2006 to offer opinions

regarding this case.  Dr. Rush has submitted a declaration that read in part:

14.     My investigation revealed that the cause of Gerawan fruit pitting in 2003
was a combination of (environmental) seasonal growing conditions and
susceptibility (predisposition) of certain varieties to fruit skin deterioration.

15.     Each growing season in the San Joaquin Valley is different with periods of
normal, ideal, and adverse environmental conditions including periods of cool,
moist, and hot, dry weather.  Those conditions affect the rate of growth (fruit
sizing) and physiological maturation (ripening) of nectarines as well as other
stonefruit.  Those conditions specifically affect the development of fruit skin and
cuticle as the crop matures and sizes.

16.     In addition to environmental conditions, practices of husbandry (fertility,
pest management, and water management) also affect and interact with the
development and heartiness of fruit skin and cuticle.

17.     The result of those interactions is variable fruit heartiness from year to
year.  This explains why fruit skin pitting has occurred over numerous growing
seasons since the current type of nectarines were established in the region dating
back to the mid 1960s.

18.     . . . I reviewed a report by Dr. Carlos Crisoto . . . who reported that the
phenomenon of fruit pitting was apparently fairly wide spread in 2003.  Dr.
Crisoto reported numerous calls from growers and evaluations in the area of
similar nectarine fruit skin issues, independent of but identical to Gerawan's fruit
quality concerns. . . .

19.     While there is some suggestion that alternate management of pre-cooling
of fruit may influence the degree of fruit skin deterioration, the core cause appears
to be the condition of the fruit when picked, which brings it back to varietal-
husbandry-environmental issues, independent of post-harvest fruit handling.
        . . . .

21.     In summary, my investigation revealed that the causes of fruit skin
deficiencies leading to pitting and desiccation in storage are related to interactions
among variety, growing conditions (environment) and (normal and usual)
practices of husbandry.

22.     Necessary and perfected post-harvest handling of fruit was not the cause of
the pitting, but was the point where pre-harvest fruit deficiencies were manifested.

10

Rush Declaration at ¶¶ 14-22.

3.      Dr. Tracey Carrillo

Dr. Carrillo, a specialist in entomology, plant pathology, and weed science, was retained by Gerawan in 2003 in order to investigate the nectarine pitting. Dr. Carrillo filed a declaration on behalf of Gerawan in opposition to summary judgment. Dr. Carrillo reviewed the experiments of George Nikolich, the reports and declaration of Dr. Whaley, and the declaration of Dr. Rush. Dr. Carrillo declares in part:

> 14.     I disagree with the opinions of Dr. Whaley and Dr. Rush regarding the cause of the pitting. Based upon my experience and review of the materials forwarded to me regarding this matter, it is my opinion that the cause of the pitting in 2003 is unknown. There is a limited amount of research and/or literature which addresses nectarine pitting. Any attempt to identify the cause of the pitting would be based on pure speculation. The cause of the pitting of these nectarines in 2003 and of nectarines in general is unknown. There is no evidence that suggests that the nectarines had a condition which caused them to destroy themselves.
>
> 15.     Based upon my review of Dr. Whaley's four reports, it is my opinion that Dr. Whaley has cited multiple inconsistent factors as the cause of the nectarine pitting, without providing scientific evidence in support of the various causes listed.
>
> Dr. Whaley's first report . . . stated that "the pitting is not something that develops directly in the field and expresses symptoms after some time in storage. It is a problem with something on the line, probably after the wax/fungicide treatment. Dr. Whaley's first report also provided that the 2003 season "predisposed" the fruit to pitting, but that in the 2003 season "was not the direct cause of the problem."
>
> Dr. Whaley then contradicts this position in his second report . . . in which he stated that the "pitting problem begins in the field." Dr. Whaley fails to offer any facts in support of this assertion and it thus appears to be based upon speculation on the part of Dr. Whaley. Dr. Whaley's [Second Report] states that 2003 season resulted in the "susceptible varieties being prone to dehydration from the lenticels." Again, the reports of Dr. Whaley do not include any facts to explain or support this theory.
>
> Dr. Whaley's third report . . . attributed the pitting to "the 2003 season" and "some equipment on the packing line." Dr. Whaley has not offered any evidence in support of either of these conclusions and again his opinion is based on speculation. Dr. Whaley's fourth report . . . conceded that "There is no documented evidence that this problem was ever found in the field and therefore it is a post harvest problem in our opinion."
>
> 16.     Based upon my review of the Declaration of Dr. Dale Rush, he has not provided any evidence in support of his conclusions regarding the cause of the pitting. Further, Dr. Rush has cited vague and inconsistent factors which he

claims caused the pitting.  Specifically, Dr. Rush has opined in ¶ 21 . . . that "growing conditions (environment) and (normal and usual) practices of husbandry" caused the pitting.  Dr. Rush has not offered any evidence or factual basis to support the theory that "growing conditions . . . and . . . practices of husbandry" were responsible for the pitting.  Further, Dr. Rush conceded in his declaration (¶ 20) that "the exact physiological cause(s) have not been adequately investigated and/or elucidated . . . ."  Dr. Rush's opinions and conclusions as to the cause of the pitting are based upon complete speculation as he has admitted that the cause is unknown, and he has failed to offer any factual basis supporting his theories or conclusions.

Carrillo Declaration at ¶¶ 14-16.[9]

### RELEVANT POLICY PROVISIONS[10]

The Westchester Policy coverage provisions provide in relevant part:

**A. Coverage**: We will pay for direct physical loss of or damage to Covered Property at the premises . . . caused by or resulting from any Covered Cause of Loss.

    **1.  Covered Property**: Covered property, as used in this Coverage Part, means the type of property described [in other sections] . . . .

        **A.1.b.  Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of described premises . . . (3) stock

    "**Stock**" is "merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packaging or shipping."

    **A.  Covered Causes of Loss** - When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is [excluded or limited].

Westchester Exhibit A; PUMF Nos. 71-74; DUMF Nos. 5, 110.

Under the "**Cause of Loss Special Form**" of the Westchester policy are the following relevant exclusions:

    2.    We will not pay for loss or damage caused by or resulting from any of the following:

    a.    Artificially generated electrical current, including electric arcing, that disturbs

---

[9]Westchester makes several objections to these paragraphs and Dr. Carrillo's declaration, including improper foundation, argumentative, and violation of Rule of Evidence 1001.  Similarly, Gerawan makes numerous objections to the declarations of Drs. Whaley and Rush.  Since neither consideration nor exclusion of some or all of these declarations would change the result of the summary judgment motion, the Court need not rule on these objections.

[10]The Policy is Westchester Exhibit A.  Additionally, the exclusions in the Westchester Policy apply with respect to the Arch and Royal excess policies.  See AUMF Nos. 21-22.

electrical devices, appliances, or wires.

b.   Delay, loss of use or loss of market.

c.   Smoke, vapor or gas from agricultural smudging or industrial operations.

d.   (1)   Wear and tear;
     (2)   Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any
           defect or any quality in property that causes it to damage or destroy itself;
     (3)   Smog;
     (4)   Settling, cracking, shrinking, or expansion;
     (5)   Nesting or infestation, or discharge or release of waste products or sections
           by insects, birds, rodents or other animals;
     (6)   Mechanical breakdown, including rupture or bursting caused by
           centrifugal force.  But if mechanical breakdown results in elevator
           collision, we will pay for the loss or damage caused by that elevator
           collision.
     (7)   The following causes of loss to personal property:
           (a)   dampness or dryness of atmosphere;
           (b)   changes or dryness of temperature; or
           (c)   marring or scratching.
     But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a
     "specified cause of loss" or building glass breakage, we will pay for the loss or
     damaged caused by that "specified cause of loss" or building or glass breakage.

Westchester Exhibit A; see also PUMF No. 76; DUMF Nos. 9, 28.

Additionally, an endorsement contains the following exclusion: "In consideration of the

premium charged at inception, the policy excludes boiler and machinery coverage, excludes

spoilage, ammonia contamination, growing crops."  PUMF No. 77; DUMF No. 36.

## SUMMARY JUDGMENT FRAMEWORK

Summary judgment is appropriate when it is demonstrated that there exists no genuine

issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755

F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to

undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-

Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the

case turns on a mixed question of law and fact and the only dispute relates to the legal

significance of the undisputed facts, the controversy for trial collapses into a question of law that

is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d
1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

> Under summary judgment practice, the moving party always bears the initial
> responsibility of informing the district court of the basis for its motion, and
> identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any," which
> it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the
burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made
in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on
file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and
upon motion, against a party who fails to make a showing sufficient to establish the existence of
an element essential to that party's case, and on which that party will bear the burden of proof at
trial. Id. at 322.  "[A] complete failure of proof concerning an essential element of the
nonmoving party's case necessarily renders all other facts immaterial." Id.

If a moving party fails to carry its burden of production, then "the non-moving party has
no obligation to produce anything, even if the non-moving party would have the ultimate burden
of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th
Cir. 2000).  If the moving party meets it initial burden, the burden then shifts to the opposing
party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at
1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles, 607
F.2d 1276, 1280 (9th Cir. 1979).  A fact is "material" if it might affect the outcome of the suit
under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986);
Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir.
2002).  A "genuine issue of material fact" arises when the evidence is such that a reasonable jury
could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248-49; Thrifty Oil,
322 F.3d at 1046.  The opposing party "must do more than simply show that there is some
metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead
a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

1    Matsushita, 475 U.S. at 587 (citation omitted).  "A motion for summary judgment may not be

2    defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'"

3    Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).

4     If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material

5    fact, the moving party is entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at

6    1103.

7         In attempting to establish the existence of a factual dispute, the opposing party may not

8    rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of

9    specific facts in the form of affidavits, and/or admissible discovery material, in support of its

10   contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank,

11   391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001).  However,

12   the opposing party need not establish a material issue of fact conclusively in its favor.  It is

13   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

14   parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; Hopper v. City

15   of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001).  Thus, the "purpose of summary judgment is to

16   'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

17   trial.'"  Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 670 F.2d 129, 132 (9th

18   Cir. 1982).

19        The court has the discretion in appropriate circumstances to consider materials that are

20   not properly brought to its attention, but the court is not required to examine the entire file for

21   evidence establishing a genuine issue of material fact where the evidence is not set forth in the

22   opposing papers with adequate references.  See Southern Cal. Gas Co. v. City of Santa Ana, 336

23   F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031

24   (9th Cir. 2001).  The evidence of the opposing party is to be believed, and all reasonable

25   inferences that may be drawn from the facts placed before the court must be drawn in favor of the

26   opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel

27   Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of

28   the air, and it is the opposing party's obligation to produce a factual predicate from which the

inference may be drawn.  See Mayweathers v. Terhune, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exist or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

## DEFENDANTS' MOTION[11]

### 1.    Covered Loss

*Defendants' Arguments*

Westchester argues that Gerawan has the initial burden of showing a covered loss. Specifically, Gerawan must show a direct physical loss or damage which was caused by or resulted from a covered cause of loss.  Gerawan must also show that the loss was fortuitous. Gerawan has never shown a cause of loss which is covered and instead has always taken the position that the cause of loss is unknown.  However, merely stating that the exact cause of loss is unknown does not show that a covered peril caused the loss of Gerawan's nectarines. Gerawan must show a covered cause of loss but cannot do so.

*Plaintiff's Opposition*

Gerawan argues that since the Policy is an "all risks" policy, all that is necessary to show a covered loss is that covered property suffered a fortuitous loss during the policy period.  Here, the nectarines are stock and thus, business personal property.  As business personal property, the nectarines are covered and there is no dispute that the nectarines suffered damage.  Further, the pitting was unexpected and more severe than had been experienced in prior years.  This is sufficient to at least raise a question regarding whether there is a covered loss.

*Legal Standard*

In first party insurance cases, "once the insured shows that an event falls within the scope

---

[11]Because the Arch and Royal policies incorporate the same conditions and exclusions as the Westchester policy, the arguments of the three insurers are essentially the same.

of basic coverage under the policy, the burden is on the insurer to prove a claim is specifically

excluded." Garvey v. State Farm Fire & Casualty Co., 48 Cal.3d 395, 406 (1989). An "all risks"

policy "covers all risks of physical loss except those excluded under the terms of the insuring

contract [and] the limits of coverage are defined by the exclusions." Benavides v. State Farm

General Ins. Co., 136 Cal.App.4th 1241, 1247 (2006).

> [In] an action upon an all-risks policy . . . the insured does not have to prove that the peril proximately causing his loss was covered by the policy. This is because the policy covers all risks save for those risks specifically excluded by the policy. The insurer, though, since it is denying liability upon the policy, must prove the policy's noncoverage of the insured's loss -- that is, that the insured's loss was proximately caused by a peril specifically excluded from the coverage of the policy.

Strubble v. United Services Auto. Assn., 35 Cal.App.3d 498, 504 (1973); S. Ins. Co. v.

Domino of Cal., 173 Cal.App.3d 619, 625 (1985); see also Pieper v. Commercial Underwriters

Ins. Co., 59 Cal.App.4th 1008, 1021 (1997); Croskey, et al., Cal. Prac. Guide: Insurance

Litigation, § 6.253 (The Rutter Group 2006) (hereinafter "Croskey"). When there are multiple

causes of a loss, where "an excluded risk is the efficient proximate or predominant cause of the

loss, there is no coverage. Stated conversely, if the predominate cause of loss is a covered risk,

the insured's claim will be covered, even if a noninsured peril contributed to the injury."

Benavides, 136 Cal.App.4th at 1247; see also Garvey, 48 Cal.3d at 403-03; Davis v. United

Servs. Auto. Ass'n, 223 Cal.App.3d 1322, 1328 (1990). The "efficient proximate cause is the

predominate, or most important cause of a loss." Julian v. Hartford Underwriters Ins. Co., 35

Cal.4th 747, 754 (2005); Garvey, 48 Cal.3d at 403.

### *Discussion*

Westchester is correct that Gerawan has the initial burden of showing a covered loss.

Given the language of the Policy, Gerawan must show "direct physical loss of or damage to

Covered Property at the premises . . . caused by or resulting from any Covered Cause of Loss."

DUMF No. 110. There is no dispute that the nectarines are "stock" and thus, are covered under

the Policy as "business personal property." There can be no dispute that "pitting" is physical

damage because "pitting" is a cosmetic condition that causes indentations of various sizes on the

surface of the nectarines. See PUMF No. 4; DUMF No. 33. Because Gerawan has shown that

17

stock suffered direct physical damage or loss in the form of pitting, cf. Shade Foods v. Innovative Prods. Sales & Mktg., 78 Cal.App.4th 847, 873-74 (2000) (finding that almonds were stock and that wood chips in the almonds that caused the almonds to be destroyed was a physical loss), the issue becomes whether the physical loss or damage was caused by a "covered cause of loss."

The term "covered cause of loss" is a defined term under the Policy and means all "Risks of Direct Physical Loss unless the loss is [excluded or limited]."  PUMF No. 74.  The definition of "covered cause of loss" essentially duplicates the requirement of a physical loss or damage. The language, "unless the loss is [excluded or limited]" merely state that there will not be coverage if an exclusion or limitation applies, it does not shift the burden to the insured (Gerawan).  See Strubble, 35 Cal.App.3d at 504;[12] see also Aydin Corp. v. First State Ins. Co., 18 Cal.4th 1183, 1190 (1998) (discussing and distinguishing *Strubble*).  Since pitting is a physical condition that caused the loss of or damage to the nectarines, pitting is a covered cause of loss.

Westchester argues that Gerawan has the burden of showing that the loss of the nectarines was caused by a covered peril.  However, in an "all risks" policy, "the insured does not have to prove that the peril proximately causing his loss was covered by the policy."  Strubble, 35 Cal.App.3d at 504;[13] S. Ins. Co., 173 Cal.App.3d at 625; see also Aydin, 18 Cal.4th at 1190. Since "all risks" of direct physical loss are covered by the Policy, and because pitting is a physical condition that caused the loss of, or damage to, the nectarines, Gerawan has met its burden of showing a covered loss.[14]  See Pieper, 59 Cal.App.4th at 1021; S. Ins. Co., 173

---

[12]*Strubble* relied in part on *Jewelers Mutual Ins. Co. v. Balogh*, 272 F.2d 889, 891-92 (5th Cir. 1959).  See Strubble, 35 Cal.App.3d at 504.  In *Balogh*, the Fifth Circuit rejected the proposition that, in an all risks policy, the insured must negative each exclusion since such a reading essentially would convert an "all risks" policy into a specific perils policy.  See Balogh, 272 F.2d at 892.

[13]Westchester attempts to limit *Strubble* to situations in which there are multiple causes of loss, some covered and some not covered.  Westchester cites no cases that have so limited *Strubble*.  The *Strubble* Court's explanation of an "all risks" policy is in general terns and not limited in the way that Westchester suggests.  This Court will not adopt Westchester's limitation.

[14]Both parties also indicate that the loss must be "fortuitous," but do not appear to argue that the concept is at issue.  In California, subject to some limitations, "any contingent or unknown event" may be insured against.  Cal. Ins. Code § 250; Sabella v. Wisler, 59 Cal.2d 21, 34 (1963).  To the extent it is an issue, given that the 2003 pitting was a large outbreak that had far exceeded pitting in prior years, see PUMF No. 5, no culpable conduct by Gerawan has been shown, and Dr. Whaley's opinion that a "predisposition" to pitting could not have been predicted, see Third Report, the loss from the 2003 pitting was "fortuitous" in that it represented a contingent or unknown event.

Cal.App.3d at 625; Strubble, 35 Cal.App.3d at 504; see also Aydin, 18 Cal.4th at 1190.

Summary judgment in favor of Westchester on this issue will be denied.

**2.     Exclusions**

*Defendants' Argument*

Westchester argues that the expert declarations of Drs. Whaley and Rush establish that growing conditions in the field caused the nectarines to develop weakened lenticels.  The weakened lenticels were not observable to the naked eye.  The weakened lenticels caused the nectarines to dehydrate and then "pit" after exposure to the normal/typical packing procedures.  The weakened lenticels made it impossible for the fruit to withstand the normal rigors of Gerawan's packing process.  In other words, the nectarines were predisposed to pitting.  The "predisposition of the fruit constitutes a defect or quality hidden within the fruit that caused the nectarines to damage themselves."  Westchester's Motion at p. 12.  Further, Dr. Rush declared that the packing process was not the cause of the pitting, but instead was the point where the pre-harvest fruit deficiencies manifested.  Accordingly, the exclusion applies.

Additionally, the exclusion for growing crops applies.  The policy does not define "growing crops."  Dr. Whaley determined that the nectarines pitted due to damaged cells (weakened lenticels) which developed while the fruit was growing.  The weakened lenticels occurred while the nectarines were in the field.  Dr. Rush's conclusions were very similar.  These experts show that the defect that caused predisposition to pitting occurred in the field while the nectarines were growing.  Thus, given these considerations and the definitions of "growing" and "crops" as found in the American Heritage Dictionary, the "growing crops" exclusion applies.

Finally, the exclusion for "marring and scratching" applies.  The American Heritage Dictionary defines "mar" as "a disfiguring mark; a blemish."  Here, "pitting" is a disfiguring mark or blemish on the nectarines.  Because pitting is a form of marring, the exclusion applies.  Also, Gerawan's reliance on Charles Miller's discussion of the marring exclusion is unavailing since Dr. Miller is discussing a wear and tear exclusion; the exclusion at issue here is a marring exclusion.

1    *Plaintiff's Opposition*

2          Gerawan argues that exclusions are interpreted narrowly against the insurer.  Dr. Carrillo

3    has opined that the cause of the pitting is unknown.  Further, Westchester's evidence does not

4    indicate that an inherent defect caused the nectarines to destroy themselves.  None of Dr.

5    Whaley's reports state that the nectarines had a hidden or latent defect.  Further, Dr. Whaley has

6    given inconsistent opinions.  At one point, Dr. Whaley concluded that pitting was not something

7    that developed in the field.  At another point, Dr. Whaley concludes that "the problem" begins in

8    the field even though no symptoms are present to the naked eye.  Further, Dr. Whaley's Third

9    Report indicates that equipment on the packing line was responsible for the pitting symptoms; it

10   did not say weakened lenticels.  Further, the Third Report states that nectarines that went directly

11   from buckets to cold storage were essentially free of pitting.  Thus, the nectarines were not

12   destroying themselves.

13         The growing crops exclusion does not apply since there was no appreciable damage to the

14   nectarines while they were on the trees.  There is no dispute that there was no pitting while the

15   nectarines were on the trees and that nothing applied to the nectarines while they were on the

16   trees caused the pitting.  Rather, the loss occurred after the fruit was picked and went through

17   post-harvesting procedures.  Dr. Whaley also acknowledged that the fruit that was picked and

18   then packed without going through processing were essentially free of pitting.  Dr. Whaley also

19   said that pitting is not something that develops in the field.  The exclusion does not apply.

20         Finally, the exclusion for "marring and scratching" does not apply.  Marring is not

21   defined by the policy.  Nevertheless, the Policy still requires that Westchester show that the

22   pitting was caused by marring or scratching, which they have not done.  Further, Charles Miller,

23   Gerawan's expert on insurance industry practices, has opined that the marring exclusion is

24   usually used to exclude losses that are caused by carelessness.  There is no evidence that

25   Gerawan is any way culpable.  Miller's declaration indicates that the marring exclusion does not

26   apply.  The cause of the pitting is unknown, and Westchester has offered no evidence that

27   anything scratched or marred the nectarines.

28

20

1   *Legal Standard*

2        Insurance policies are contracts to which the ordinary rules of contract interpretation

3   apply.  Ward General Ins. Services, Inc. v. Employers Fire Ins. Co., 114 Cal.App.4th 548, 552

4   (2003).  "The fundamental goal of contractual interpretation is to give effect to the mutual

5   intention of the parties."  Bank of the West v. Superior Court, 2 Cal.4th 1254, 1264 (1992);

6   Ward, 114 Cal.App.4th at 552.  An insurance policy is interpreted such that the words are

7   "understood in their ordinary and popular sense, rather than according to their strict legal

8   meaning; unless used by the parties in a technical sense, or unless a special meaning is given to

9   them by usage, in which case the latter must be followed."  Cal. Civ. Code § 1644; Pieper, 59

10   Cal.App.4th at 1017.  Thus, "if contractual language is clear and explicit, it governs."  Bank of

11   the West, 2 Cal.4th at 1264.  When confronted with ambiguous language, the California Supreme

12   Court has directed:

13        Language in an insurance policy is interpreted as a whole, and in the
     circumstances of the case, and cannot be found to be ambiguous in the abstract.

14        The proper question is whether the [provision or] word is ambiguous in the
     context of this policy and the circumstances of this case.  The provision will shift

15        between clarity and ambiguity with changes in the event at hand.  Ambiguity is
     resolved by interpreting the ambiguous provisions in the sense the [insurer]

16        believed the [insured] understood them at the time of formation.  If application of
     this rule does not eliminate the ambiguity, ambiguous language is construed

17        against the party who caused the uncertainty to exist.  This rule, as applied to a
     promise of coverage in an insurance policy, protects not the subjective beliefs of

18        the insurer but, rather, the objectively reasonable expectations of the insured.  Any
     ambiguous terms are resolved in the insureds' favor, consistent with the insureds'

19        reasonable expectations.

20   E.M.M.I., Inc. v. Zurich American Ins. Co., 32 Cal.4th 465, 470-71 (2004) (internal citations and

21   quotations omitted).  "Contractual language is ambiguous if it is susceptible to more than one

22   reasonable interpretation in the context of the policy as a whole."  Palmer v. Truck Ins.

23   Exchange, 21 Cal.4th 1109, 1115 (1999); American Alternative Ins. Corp. v. Superior Court, 135

24   Cal.App.4th 1239, 1245 (2006).  The lack of a definition for a term, although not necessarily,

25   "might weigh, even strongly, in favor of finding an ambiguity."  Bay Cities Paving & Grading,

26   Inc. v. Lawyers' Mutual Ins. Co., 5 Cal.4th 854, 866–67 (1993); American Alternative, 135

27   Cal.App.4th at 1247.

28        A policy's terms must be read in context and in reference to the policy as a whole.  See

1  Cal. Civ. Code § 1641; <u>Bay Cities</u>, 5 Cal.4th at 867.  Similarly, the "organization and structure of

2  an insurance policy may be relevant in determining its meaning."  Croskey at § 4:110; <u>see also</u>

3  <u>American Star Ins. Co. v. Insurance Co. of the West</u>, 232 Cal.App.3d 1320, 1327 (1991).

4        Also, "It is the general rule that when there is a known usage of the trade, persons

5  carrying on that trade are deemed to have contracted in reference to the usage unless the contrary

6  appears; that the usage forms a part of the contract, and that evidence of usage is always

7  admissible to supply a deficiency or as a means of interpretation where it does not alter or vary

8  the terms of the contract . . . ."  <u>California Lettuce Growers, Inc. v. Union Sugar Co.</u>, 45 Cal.2d

9  474, 482 (1955); <u>see</u> <u>Midwest TV v. Scott, Lancaster, Mills & Atha</u>, 205 Cal.App.3d 442, 451

10 (1988).  Insurance industry publications may be considered in determining whether a policy term

11 has a particular meaning within the insurance industry.  <u>See</u> Croskey at § 4:151.

12        Finally, policy exclusions are strictly construed, while exceptions to exclusions are

13 broadly construed in favor of the insured.  <u>See</u> <u>E.M.M.I.</u>, 32 Cal.4th at 471; <u>MacKinnon v. Truck</u>

14 <u>Ins. Exchange</u>, 31 Cal.4th 635, 648 (2003); <u>Aydin</u>,18 Cal.4th at 1192.

15 <u>*Discussion*</u>

16      A.     <u>Hidden or Latent Defect or Quality In Property That Causes It To Damage Or</u>
               <u>Destroy Itself</u>

17        Initially, there is a disagreement between Dr. Carrillo and Drs. Whaley and Bush.  Dr.

18 Carrillo believes that the cause of the pitting is unknown and that no latent defect or inherent

19 quality within the nectarines caused self-damage or self-destruction.  Dr. Carrillo further believes

20 that the cause of pitting is not generally known in the appropriate scientific community and that

21 Dr. Rush and Dr. Whaley are relying on pure speculation.  While Dr. Carrillo's opinions are not

22 particularly detailed, she does cast doubt on Drs. Whaley and Rush's opinions as unduly

23 speculative.  A jury would not be bound to accept the opinions of Dr. Rush and Dr. Whaley if

24 they believed that their opinions were based too heavily on speculation.

25        Irrespective of Dr. Carrillo, summary judgment is inappropriate based on the language of

26 the exclusion itself.  The Policy does not provide any definitions with respect to this exclusion.

27 Neither party argues that the exclusion is ambiguous and neither party cites California cases that

28

deal with this exclusion.  In California, for a defect to be latent, the defect must be substantially

difficult to discover and not readily observable.  See Scott v. Confidential Ins. Co., 44

Cal.App.4th 24, 31 (1996); Croskey at §§ 6:311, 6:314.  "Damage from an inherent cause is . . . a

'certainty' and is therefore uninsurable."  Croskey at § 6:306; see Scott, 44 Cal.App.4th at 36.

Westchester has cited a case from Washington that interpreted an "inherent vice" exclusion.[15]

That court explained that such an exclusion "does not relate to an extraneous cause but to a loss

[resulting] entirely from internal decomposition or some quality which brings about [the

property's] own injury or destruction.  The vice must be inherent in the property for which

recovery is sought."  Port of Seattle v. Lexington Ins. Co., 48 P.3d 334, 338-39 (Wash. App.

2002).  Gerawan does not challenge this interpretation of the exclusion or indicate that California

law is to the contrary.  Given the apparent agreement of the parties, the Court finds *Port of*

*Seattle*'s explanation to be persuasive and consistent with the plain meaning of "a hidden or

latent defect or quality in property that causes it to damage or destroy itself."

        As applied to this case, Westchester's experts have identified weakened lenticels as

hidden or latent defects or qualities in the nectarines that cause the nectarines to damage or

destroy themselves.  The experts further opined that the lenticels weakened as they grew and

developed in the field.  It seems relatively clear that weakened lenticels could constitute a defect

within the nectarines.  Also, since the lenticels are not observable to the naked eye, there is no

dispute that weakened lenticels would be latent.  However, the Policy exclusion is for a "hidden

or latent defect or quality in property that causes it damage or destroy itself."  Westchester

Exhibit A at Exclusion 2.d.(2).

        Nikolich's experiments, as acknowledged and accepted by Dr. Whaley, revealed that

nectarines that were picked, placed into boxes, and then put directly into cold storage without

going through standard processing did not develop pitting.[16]  See Westchester Exhibit U; Whaley

_____

[15]Latent defect and inherent vice exclusions are usually analyzed together.  Croskey at § 6:306.

[16]At oral argument, Westchester's counsel indicated that Dr. Whaley and Dr. Rush opined that the
nectarines would develop pitting naturally and irrespective of the packing process.  However, Dr. Whaley's report
and declaration and Dr. Rush's declaration do not support counsel's assertion.  In the evidence presented to the
Court, neither doctor states that pitting will inevitably occur irrespective of the packing process.

First, Second, and Third Reports.  This is critical evidence.  It indicates that nectarines, essentially left to their own devices, would not pit.  Instead, this experiment suggests that an outside force, something in or the entirety of the packing and processing procedures of Gerawan, led to the pitting.  "When the fruit was passed over the packing line something triggered the pits to occur."  Whaley Fourth Report.  *Port of Seattle* explained that an exclusion for a latent defect/inherent vice "does not relate to an extraneous cause."  Port of Seattle, 48 P.3d at 338-39.  The packing procedures are an extraneous force to the nectarines, and it was when those procedures were applied to the nectarines that pitting occurred.  The evidence is inconsistent with notion that pitting would certainly and naturally occur without the influence of extraneous or outside forces.  Cf. Scott, 44 Cal.App.4th at 36; Croskey at § 6:306; Port of Seattle, 48 P.3d at 338-39.

Westchester argues that the nectarines were predisposed to pitting.  The evidence from Dr. Whaley and Dr. Rush support this proposition.  However, the evidence suggests that the nectarines's predisposition is not to pitting entirely on their own; instead, the predisposition is to pitting when exposed to an extraneous or outside force.  Merely stating that the nectarines were "predisposed" is an attempt to draw attention away from the evidence that the nectarines did not pit when exposure to Gerawan's packing and processing procedures was avoided.  Cf. Vana Trading Co. v. S.S. Mette Skou, 556 F.2d 100, 103-04 (2d Cir. 1977) (upholding decision that yams did not suffer from an inherent vice where the trial court's use of "the term 'susceptible' . . . meant only that [the yams] were particularly able to be affected by the conditions under which they were packed, stowed, and unloaded and not that their condition was such that they would have deteriorated merely through 'a lapse of time.'").  The fact remains that it was only when the extraneous or outside force of the packing and processing procedures were applied to the nectarines that pitting would occur.  This evidence suggests that the exclusion for "a hidden or latent defect or quality in the [nectarines] that causes [the nectarines] to damage or destroy themselves*"* does not control.[17]  Cf. City of Renton v. Lexington Ins. Co. (USA), 2007 U.S. Dist.

---

[17]Dr. Rush opines that the packing process causes the full damage of the weakened lenticels to manifest, and that the pitting was not caused by the packing process.  See Rush Declaration at ¶¶ 21-22.  Nikolich's experiment suggests otherwise since nectarines that did not go through the packing process did not pit.

1    LEXIS 69959, *21 (W.D. Wash. 2007) (finding that an "inherent vice" exclusion applied where

2    an "ill-designed bridge '[brought] about its own injury' and no application of external events was

3    necessary."). Summary judgment on the basis of this exclusion is inappropriate.

4         B.    Growing Crops

5         The term "growing crops" is not defined in the Policy and the Court is aware of no case

6    that has defined the term. The term "growing crops" appears in both an endorsement and in a

7    section of the Policy that reads: "2. Property not covered: Covered property does not include: . .

8    . Land (including land on which the property is located), water, growing crops, or lawns."

9    Westchester Exhibit A. Since the term "growing crops" is undefined, a common understanding

10   of the term can be used. Cal. Civ. Code § 1644. From a "lay" perspective, "growing crops"

11   indicates crops that are still maturing in the field and are distinct from "harvested crops."

12        This lay understanding is consistent with analogous case law.[18] The Maryland Supreme

13   Court dealt with an insurance policy that "provided insurance against loss by fire to farm produce

14   (excluding tobacco and growing crops), feed, seed and supplies while in said barns and

15   outbuildings or on premises outside of buildings." Dyer v. Royal Ins. Co., 150 A.2d 915, 916

16   (Md. 1959). Relying in part on analogous out of state cases, the Maryland Supreme Court

17   concluded, "the intention of the parties was that unharvested crops were not insured." Id. In the

18   context of deciding ownership of crops, it has been held that "the general rule" in California is

19   that "*growing crops* remain a part of the realty *until severed* and, unless reserved in writing, pass

20   with the title to the grantee."[19] People v. Maxfield, 30 Cal.2d 485, 488 (Cal. 1947) (emphasis

21   added). In the context of a farmer recovering his land from a trespasser, the "rule applicable to

22   crops grown and harvested upon land by a trespasser or one in unlawful possession . . . would

23   seem to be that if the possession is recovered by the owner, he takes the *growing crops* with the

24   land; but that *crops harvested* are the property of the one in unlawful possession, and the owner's

25   remedy is to recover the rental value of his land." Imperial Farming Co. v. Van Horn, 107

26   _____

27        [18]The Court has been unable to find a California insurance case that interpreted the "growing crops"
     exclusion and the parties have cited no cases, California or otherwise.

28        [19]This is also consistent with the portion of the Policy that has includes "growing crops" as part of an
     exclusion for "land" as "property uncovered."

                                        25

1  Cal.App. 717, 721 (1930).  Again in the context of property ownership, the Michigan Supreme

2  Court explained that the words "growing crops" has "been commonly employed to distinguish

3  crops still attached to the ground, rather than to mark any distinction between the 'ripe and

4  unripe' crops."  Tripp v. Hasceig, 20 Mich. 254, 260 (1870).  Based on the above authorities, this

5  Court concludes that the term "growing crops" refers to crops that are unharvested or unsevered

6  from the land.

7       As applied to this case, the loss incurred by Gerawan was due to pitting and the damage

8  that made the nectarines unmarketable by Gerawan was the pitting.  It is undisputed that pitting

9  did not occur while the nectarines were on the trees, rather, pitting was a "post-harvest"

10  phenomena.  See PUMF No. 68.  Because the pitting afflicted the nectarines post-harvest and not

11  while the nectarines were still on the trees/in the field, the evidence suggests that the exclusion

12  does not control.

13       Westchester's evidence suggests that the nectarines's lenticels weakened while the

14  nectarines were growing and still on the trees.  See Whaley Declaration at ¶ 13; Rush Declaration

15  at ¶¶ 19, 21-22.  However, in Nikolich's experiments, the varieties of nectarines that were pitting

16  prior to the claim were the same types used in the experiments.  See Westchester Exhibit U.

17  With the one notable exception, Nikolich's experiments yielded pitted nectarines.  See id.; see

18  also Whaley First, Second, Third Reports.  Thus, the nectarines in Nikolich's experiments also

19  had weakened lenticels, assuming that Drs. Whaley and Rush are correct.  Despite the weakened

20  lenticels, the nectarines that went directly into cold storage did not pit.  Accordingly, weakened

21  lenticels and pitting are distinct conditions.  Westchester's argument attempts to shift the focus

22  entirely away from the pitting and towards the weakened lenticels.  Since some nectarines in

23  Nikolich's experiment did not pit, despite weakened lenticels, and since pitting is the damage for

24  which Gerawan seeks compensation, shifting the focus exclusively to the lenticels is unavailing.

25       C.    Marring

26       There is no challenge to the definition of "mar" put forward by Westchester, which is the

27  definition used by the American Heritage Dictionary.  Thus, the Court will accept that "mar"

28  means "a disfiguring mark or blemish."  American Heritage Dictionary at 844 (Fourth Ed.).  A

"blemish" is an imperfection that seriously impairs appearance.  See Merriam-Webster On-Line

Dictionary.[20]  Given the definition of "blemish," pitting is clearly a blemish and thus, the pitted

nectarines were marred.  On first blush, it would appear then that the marring exclusion applies

and coverage should be denied.  However, the Court believes that for the marring exclusion to

apply, Westchester must show more than that the property simply has a disfiguring mark or a

blemish.

        A Court may look to the organization or structure of a policy while interpreting specific

provisions.  See American Star, 232 Cal.App.3d at 1327; Croskey at § 4:110.  The structure of

the Policy's exclusion is particular.  Exclusion 1 (which is not at issue) is divided into seven

subparagraphs, "a." through "g."  The seven subparagraphs have headings and some have

subparagraphs of their own, which are identified with numerals and letters in parentheses.  See

Westchester Exhibit A.  For example, the exclusion for "water" reads:

> g.      Water
>         (1) flood, surface water, waves . . .;
>
>         (2) mudslide or mudflow;
>
>         (3) water that backs up or overflows from a sewer . . .;
>
>         (4) Water under the ground surface pressing on, or flowing or seeping through:
>                 (a) Foundations, walls, floors, or paved surfaces;
>                 (b) Basements, whether paved or not; or
>                 (c) Doors, windows, or other openings.
>
> But if Water, as described in g.(1) through g.(4) above, results in fire, explosion, or
> sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion, or
> sprinkler leakage

Id.

After exclusion 1.g., exclusion 2 begins.  Exclusion 2 has four subparagraphs, "a." through "d."

Id.  The marring exclusion is exclusion number 2.d.(7)(c).  Id.  None of exclusion 2's

subparagraphs have headings.  Subparagraphs 2.a. through 2.c. have no subparagraphs of their

---

[20]The American Heritage Dictionary definition of "blemish" is not helpful: "an imperfection that mars or impairs."  American Heritage Dictionary at 153.  Similarly, the Merriam-Webster definition of "mar" is too broad: "to detract from the perfection or wholeness of; spoil."  See Merriam-Webster On-Line Dictionary.  Although consistency may counsel in favor relying on a single dictionary, the Court believes that the American Heritage definition of "mar" is preferable because it is not so broad, and the Merriam-Webster definition of "blemish" is preferable because it is more descriptive.

own and appear to be "stand alone" exclusions.  Subparagraph 2.d., however, has seven

subparagraphs.  Although there is no heading for subparagraph 2.d., given the structure of other

exclusions (in particular the "water" exclusion which is nearly identical in structure to 2.d.(7)),

exclusions 2.d.(1) through 2.d.(7) are all related.

Expert testimony regarding industry understanding or usage is admissible to help interpret

a contract term.  See California Lettuce, 45 Cal.2d at 482.  Gerawan has submitted the

declaration of Charles Miller, who has expertise in insurance industry practices.  Miller has

declared in relevant part:

> Westchester also relied upon the exclusion in the Policy for marring and
> scratching and wear and tear.  In the insurance industry this exclusion is
> understood to apply to a loss "because they usually result from carelessness."  As
> pointed out elsewhere in an insurance publication, the **"purpose of an exclusion
> for wear and tear, marring and gradual deterioration is to exclude
> maintenance type losses that naturally occur over time**."  The Fidelity Casualty
> & Surety Bulletin notes that, "the purpose of the wear and tear exclusion in
> property coverage policies is to eliminate insurance recovery in situations where
> claim is made on property, which has been damaged through normal use, abuse or
> has simply been "used up."

Miller Declaration at ¶ 22 (emphasis added).[21]

In light of Miller's declaration and the structure of the exclusions, the Court concludes

that exclusion 2.d. is a variation of a wear and tear exclusion.  While damage or loss caused by

wear and tear is not identical to damage caused by smog, animal infestation, mechanical

breakdown, or marring, they are related.  The items listed in paragraphs 2.d.(1) through 2.d.(7)

are all perils that one may ordinarily think of as occurring naturally over time as property is

used.[22]

This conclusion is bolstered by examining other insurance policies.  In the *California

Insurance Practice Guide*, it is noted that a "common exclusion in property insurance is for –

'wear and tear, marring, deterioration, inherent vice, latent defect, and mechanical breakdown."

Croskey at § 6:301.  In *Sabella v. Wisler*, 59 Cal.2d 21, 26 (1963), an "all risks" building

---

[21]Westchester makes numerous objections to this paragraph of Miller's declaration.  The Court finds the
objections to be without merit; they are overruled.

[22]The Court also believes that an ordinary understanding of the entire 2.d. exclusion supports this
interpretation.  See Cal. Civ. Code. § 1644.

endorsement that was part of a fire insurance policy excluded coverage for loss caused by "termites or other insects; wear and tear; deterioration; smog; smoke from agricultural smudging or industrial operations; rust; wet or dry rot; mold; mechanical breakdown; settling, cracking, shrinkage, or expansion of pavements, foundations, walls, floors, or ceilings . . . ." In *Acme Galvanizing Co. v. Fireman's Fund Ins. Co.*, 221 Cal.App.3d 170, 174 (1990), the "all risks" policy excluded, "Inherent vice, latent defect, wear and tear, marring and scratching, gradual deterioration, moths, termites or other insects or vermin . . ." In Miller's declaration, he identifies an exclusion for "wear and tear, marring, and gradual deterioration." In the Policy in this case, "wear and tear," is exclusion 2.d.(1),"rust," "fungus," "deterioration" and "latent defect" is exclusion 2.d.(2), "smog" is exclusion 2.d.(3), "settling, cracking, shrinkage, or expansion" is exclusion 2.d.(4), "vermin" and "insects" is exclusion 2.d.(5), "mechanical breakdown" is exclusion 2.d.(6), and marring is exclusion 2.d.(7)(c). Cf. Sabella, 59 Cal.2d at 26; Acme Galvanizing, 221 Cal.App.3d at 174; Croskey at § 6:301; Miller Declaration ¶ 22 with Westchester Exhibit A. It appears that Westchester has identified numerous sorts of "wear and tear" damages, i.e. damages that occur naturally over time, and instead of one single exclusion without subparts, Westchester created one exclusion with multiple subparts. The splitting of these "wear and tear" type of perils and the lack of a heading does not change the nature of exclusion 2.d: they are all exclusions that deal with damage or perils that can be expected to occur naturally over time as property is used.[23]

The Court has found one case that has addressed an exclusion for "marring." In an unpublished opinion, a Connecticut Court was faced with an exclusion for "wear and tear, marring, and deterioration." Ehsan v. Ericson Agency, 2003 Conn. Super. LEXIS 1969 (Conn. Super. Ct. 2003). The *Ehsan* Court accepted the same definition of mar that this Court has adopted: a disfiguring mark or blemish. After examining the exclusion, the *Ehsan* Court

---

[23]Additionally, in *242-44 E. 77t h St., LLC v. Greater N.Y. Mut. Ins. Co.*, 815 N.Y.S.2d 507, 509 (1st Dept. 2006), the "all risks" policy contained an exclusion for "other types of loss" that included, "settling, cracking, shrinking or expansion," "wear and tear," "rust, corrosion, fungus, decay, deterioration or any quality in property that causes it to damage or destroy itself," "smog," "nesting or infestation," and "dampness or dryness of atmosphere" or "changes in or extremes in temperature." The New York Court held that the above exclusions all "share a common characteristic: they are naturally occurring events." Id.

explained, "Given the context of the word in this policy, adjacent to the terms 'wear and tear' and 'deterioration,' the term is meant to include that marring of appearance caused by wear and tear or deterioration resulting from the reasonable and normal use of an object over time." Id. at *48 n.18. This Court finds the analysis persuasive. In the Policy of this case, "marring" is not adjacent to "wear and tear" or "deterioration," but "marring" is part of a large exclusion with many related subparts, including "wear and tear" and "deterioration."

In light of the structure of exclusion 2.d, Miller's expert testimony, the language of "non-subparted" exclusions in other policies/cases, this Court holds that the exclusion for "marring" in the Policy applies to disfiguring marks or blemishes that occur naturally over time through the reasonable and normal use of an object.

As applied to this case, the evidence indicates that the nectarines pitted after they were packed and processed in the usual and customary manner. However, the evidence also indicates that the pitting experienced by Gerawan was unusual, extraordinary, and unexpected. See PUMF No. 5; Whaley Third Report. Given this evidence, a reasonable jury could conclude that the pitting in this case is not the type of blemish that naturally occurs over time through normal and reasonable use. Accordingly, summary judgment is inappropriate.

### 3.   **Bad Faith**[24]

#### *Defendant's Argument*

Westchester argues that summary judgment is appropriate because there was a good faith dispute regarding the cause of the pitting. Neupert visited Gerawan's facility and spoke with Gerawan personnel within days of Gerawan's claim. Westchester argues that it also regularly kept in contact with Gerawan and hired Dr. Whaley within three weeks of Gerawan's claim. Dr. Whaley actively investigated the cause of the pitting and authored four reports. Upon completion of the investigation, and upon reliance on Dr. Whaley's four reports, coverage was denied. Westchester did not conduct a cursory investigation and the denial is based on a genuine dispute. Additionally, part of the "delay" in denying the claim was due to Gerawan's own conduct. On

---

[24]Gerawan's bad faith claim is made against only Westchester.

several occasions Westchester requested information from Gerawan, but the information was not received until months later.  Accordingly, Westchester acted reasonably and in good faith.

### Plaintiff's Opposition

Gerawan argues that Westchester did not act reasonably.  Westchester took 16 months to deny the claim.  Dr. Whaley did no further investigation between December 2003 and December 2004.  Further, Dr. Whaley's first three reports are inconsistent and cite multiple inconsistent things as the cause of the pitting without supplying objective facts to support those causes. Neupert and Adair had questions after receiving the reports, and yet did not follow up or get clarification from Dr. Whaley.  The investigation was thus, inadequate.  Further, because the cause of the pitting is unknown, application of the Policy exclusions was unreasonable.  Further, Westchester was obligated to deny or pay the claim within 40 days of receipt of the claim or notify Gerawan every 30 days of its need for additional time to make a determination and any additional information needed to make such a decision.  Gerawan did not receive notices every 30 days.  Given Westchester's conduct, summary judgment should be denied.

### Legal Standard

A "bad faith" claim against an insurer is based on a breach of the implied covenant of good faith and fair dealing, which exists to assure the insurer makes prompt payment of claims to the insured.  Buxbaum v. Aetna Life & Casualty Co., 103 Cal.App.4th 434, 442 (2002).  All insurance contracts include the implied covenant of good faith and fair dealing.  See Century Surety Co. v. Polisso, 139 Cal.App.4th 922, 948 (2006); Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc., 78 Cal.App.4th 847, 879 (2000).  Where an insurer engages in unreasonable conduct in connection with an insured's insurance claim, the insurer is said to have tortiously breached the implied covenant.  See Polisso, 139 Cal.App.4th at 948 (citing Egan v. Mutual of Omaha Ins. Co., 24 Cal.3d 809, 818-19 (1979)).  To establish a bad faith claim, the insured must show that:  (1) benefits due under the policy were withheld; and (2) the reason for withholding the benefits was unreasonable or without proper cause.  See Neal v. Farmers Ins. Exchange, 21 Cal.3d 910, 920 (1978); Polisso, 139 Cal.App.4th at 949.

[A] breach of the implied covenant of good faith and fair dealing involves

something more than a breach of the contract or mistaken judgment.  There must be proof the insurer failed or refused to discharge its contractual duties not because of an honest mistake, bad judgment, or negligence, but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.

Polisso, 139 Cal.App.4th at 948; Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., 90 Cal.App.4th 335, 345-46 (2001).   Stated differently, the "erroneous denial of a claim does not alone support tort liability; instead, tort liability requires that the insurer be found to have withheld benefits unreasonably."  Tomaselli v. Transamerica Ins. Co., 25 Cal.App.4th 1269, 1280 (1994).  The reasonableness of the insurer's decisions and actions "must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors."  CalFarm Ins. Co. v. Krusiewicz, 131 Cal.App.4th 273, 286 (2005); see Polisso, 139 Cal.App.4th at 949.  An insurer must give at least as much consideration to the interests of its insured as it does to its own.  See Egan, 24 Cal.3d at 818-819; Chateau Chamberay, 90 Cal.App.4th at 347.  Nevertheless, an "insurer is not a fiduciary, and owes no obligation to consider the interests of its insured above its own."  Morris v. Paul Revere Life Insurance Co., 109 Cal.App.4th 966, 973 (2003).

Conduct such as "delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant . . . ."  McMillin Scripps North Partnership v. Royal Ins. Co., 19 Cal.App.4th 1215, 1222 (1993).  "Among the most critical factors bearing on the insurer's good faith is the adequacy of its investigation of the claim."  Shade Foods, 78 Cal.App.4th at 879-80.  "An unreasonable failure to investigate amounting to such unfair dealing may be found when an insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and damages."  Shade Foods, 78 Cal.App.4th at 880; see Jordan v. Allstate Ins. Co., 148 Cal.App.4th 1062, 1074 (2007).   Further, violations of the insurance code and regulations of the California insurance commission may also be sufficient to show a breach of the duty of good faith and fair dealing.  See Jordan, 148 Cal.App.4th at 1078; Rattan v. United Servs. Auto. Ass'n, 84 Cal.App.4th 715, 724 (2000).  Also, bad faith may be found where the insurer unreasonably delays in processing or paying claims.  See Cardiner v. Provident Life &

Accident Ins. Co., 158 F.Supp.2d 1088, 1099 (C.D. Cal. 2001); Lincoln Property Co., N.C., Inc. v. Travelers Indemnity Co., 137 Cal.App.4th 905, 914 (2006); Love v. Fire Ins. Exch., 221 Cal.App.3d 1136, 1148 (1990).

However, while withholding benefits due under a policy may constitute a breach of contract, liability in tort arises only if the conduct was unreasonable, and the withholding of benefits due under the policy is not unreasonable if there is a genuine dispute between the insurer and the insured as to coverage or the amount of payment due.  See Jordan, 148 Cal.App.4th at 1072; Rappaport-Scott v. Interinsurance Exchange of the Automobile Club, 146 Cal.App.4th 831, 837 (2007); CalFarm, 131 Cal.App.4th at 286-87; Chateau Chamberay, 90 Cal.App.4th at 349.  The "genuine dispute" doctrine holds "that an insurer does not act in bad faith when it mistakenly withholds policy benefits if the mistake is reasonable or is based on a legitimate dispute as to the insurer's liability."  Polisso, 139 Cal.App.4th at 948.  "In the insurance bad faith context, a dispute is not 'legitimate' unless it is founded on a basis that is reasonable under all the circumstances."  Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 725 n.7 (2007).  "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim.  A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds."  Id. at 725.  "The 'genuine dispute' doctrine may be applied where the insurer denies a claim based on the opinions of experts."  Chateau Chamberay, 90 Cal.App.4th at 347; Fraley v. Allstate Ins. Co., 81 Cal.App.4th 1282, 1292 (2000).  The "genuine dispute" defense may be inapplicable if the insurer engaged in a biased investigation.  Chateau Chamberay, 90 Cal.App.4th at 785-86.  A biased investigation may be shown where: (1) the insurer was guilty of misrepresenting the nature of the investigatory proceedings; (2) the insurer's employees lie during deposition or to the insured; (3) the insurer dishonestly selected its experts; (4) the insurer's experts were unreasonable; and (5) the insurer failed to conduct a thorough investigation.  Guebara v. Allstate Ins. Co., 237 F.3d 987, 996 (9th Cir. 2001); Chateau Chamberay, 90 Cal.App.4th at 348-49.

"The reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact."  Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1010 (9th Cir. 2004);

1    Chateau Chamberay, 90 Cal.App.4th at 346.  An insurer is not entitled to a judgment as a matter

2    of law where, viewing the facts in the light most favorably to the insured, a jury could conclude

3    that the insurer acted unreasonably.  See Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152,

4    1161 (9th Cir. 2002); Hubka v. Paul Revere Life Ins. Co., 215 F.Supp.2d 1089, 1092 (S.D. Cal.

5    2002); Wilson, 42 Cal. 4th at 725.

6        *Discussion*

7        The key to a "bad faith" claim is reasonableness.  Viewed in the light most favorable to

8    Gerawan as the non-moving party and making all reasonable inferences in Gerawan's favor, the

9    Court believes that summary judgment is not appropriate at this time.

10       The evidence does not indicate that Westchester acted unreasonably in the initial stages of

11   the investigation.  Adair quickly appointed Neupert, who promptly visited Gerawan's facility,

12   viewed the nectarines, and spoke with Gerawan employees.  Neupert requested and received

13   approval from Westchester to hire Dr. Whaley.  See PUMF Nos. 8-13; DUMF Nos. 52-55.  Dr.

14   Whaley worked closely with Gerawan personnel, issued the First Report on December 3, 2003,

15   and the Second Report on January 5, 2004, after receiving additional information from Nikolich.

16   PUMF Nos. 16, 20-24, 29.  However, after January 5, 2004, Westchester's investigation appears

17   to have stagnated.  Dr. Whaley authored a third report on December 6, 2004, but the Third

18   Report was merely a summary of his conclusions from the First and Second reports.  See Third

19   Report.  The parties have provided no evidence that indicates that either Westchester or Dr.

20   Whaley did anything further to determine the cause of the pitting in the eleven month interval

21   (January 3, 2004, to December 6, 2004) between the Second and Third Reports.[25]

22   ─────────────

23       [25]In the December 17, 2004, denial letter, Westchester's counsel indicated that a supplemental reservation
     of rights letter was sent to Gerawan on November 19, 2004.  It is indicated that the supplemental reservation
24   requested Gerawan to provide it with Gerawan's investigation and conclusions regarding the pitting.  See
     Westchester Exhibit S.  The November 19, 2004, reservation has not been provided to the Court.  However,
25   Gerawan's counsel responded to the December 17, 2004, denial and acknowledged the November 19, 2004,
     reservation.  See Westchester Exhibit U.  Gerawan's counsel indicates that the requested information had been
26   previously provided to Dr. Whaley.  See id.  Additionally, Dr. Whaley's Second Report states that it is commenting
     on Nikolich's report that was entitled, "Nectarine Pitting Trial, Gerawan Farming, Inc., August 2003."  Second
27   Report.  Accordingly, the November 19, 2004, reservation was requesting information that had already been turned
     over to Dr. Whaley and analyzed by him.  This request for information that was essentially already in Westchester's
28   possession, and which was made approximately two weeks prior to the issuance of the Third Report, does not change

1    It is true that Westchester requested information from Gerawan and Gerawan took six

2 months to provide that information.  See PUMF Nos. 51, 53.  However, the information

3 requested dealt with the dollar amount of the damages, as well as efforts to sell the pitted

4 nectarines.  See PUMF No. 51; DUMF Nos. 61-64; Westchester Exhibits M, N, O.  Once

5 Westchester received the requested dollar amount, it sent the documentation to an accountant for

6 analysis.[26]  See DUMF Nos. 65-67.  There is no dispute that the information requested by

7 Westchester in March 2004, and ultimately provided in September 2004, was necessary for

8 analyzing the claim for damages.  See DUMF No. 68.  Nevertheless, it is unclear how

9 information regarding the exact dollar amount of damage suffered is relevant to the issue of the

10 cause of the loss.  This is significant because Westchester denied Gerawan's claim outright.  See

11 Westchester Exhibit S.  In its December 17, 2004, denial letter, Westchester did not question or

12 dispute the dollar amount of the damages claimed.  Instead, it stated that Gerawan had not shown

13 a covered loss, and, on the basis of Dr. Whaley's three reports, that a myriad of exclusions

14 applied.[27]  See id.  This indicates that the denial on December 17, 2004, of Gerawan's claim was

15 based exclusively on information that had been in Westchester's possession since January 5,

16 2004, i.e. Dr. Whaley's First and Second Reports.

17    Additionally, although Adair reviewed Dr. Whaley's first two reports and still had

18 questions in his mind about causation, no new reports from Dr. Whaley were obtained until after

19 Westchester received the dollar amount of damages claimed, nearly $5 million.  There is at least

20 an appearance that activity started again only when it became apparent that substantial amounts

21 of money were involved.  Further, the fact that questions lingered in the adjuster's mind after

22 reading Dr. Whaley's reports, yet no clarification and no further reports were obtained until

23 ─────────────

24 the perception that Westchester did nothing to determine the cause of the pitting for, at best, nearly eleven months.

25    [26]A coverage opinion was requested on October 21, 2004, see DUMF No. 86, which was more than nine
26 months after the Second Report had been issued.

27    [27]The denial letter also did not explain how any of the exclusions applied.  The denial letter lists the
exclusions and then in one paragraph states that there is no coverage.  The denial letter is general and does not
28 actually attempt to explain or apply the various listed exclusions.  Gerawan's counsel attempted to obtain
clarification from Westchester regarding the basis of denial, see PUMF No. 62, but was apparently unsuccessful.

December 2004 indicates that evidence was being ignored or not properly and diligently being developed.

Additionally, the evidence indicates that Westchester violated its duty to notify Gerawan every 30 days that additional time and/or information was needed before it could make a decision on the claim.  See 10 Cal. Code. Reg. § 2695.7(c)(1).

Bad faith is generally a question of fact for a jury, see Chateau Chamberay, 90 Cal.App.4th at 346.  A finding of bad faith may be supported due to an inadequate investigation, unreasonable dilatory claims decisions, and failure to follow California insurance regulations. See Cardiner, 158 F.Supp.2d at 1099; Jordan, 148 Cal.App.4th at 1074; Shade Foods, 78 Cal.App.4th at 880; Love, 221 Cal.App.3d at 1148.  "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim."  Wilson, 42 Cal.4th at 725.  Here, the amount of time it took to deny the claim, an apparent violation of California regulations, and the nature of the investigation are all at issue and cast doubt upon the reasonableness of Westchester's conduct.  Viewing the evidence in the light most favorable to Gerawan, the Court believes that a reasonable jury could find bad faith conduct by Westchester.  Accordingly, summary judgment is inappropriate.  Amadeo, 290 F.3d at 1161; Hubka, 215 F.Supp.2d at 1092; Wilson, 42 Cal.4th at 725.

**CONCLUSION**

Westchester, Arch, and Royal all move for summary judgment.  All three argue that Gerawan has not shown that a covered cause of loss was responsible for the pitting and that three exclusions apply: (1) growing crops, (2) marring, and (3) inherent or latent defect or quality in property that causes property to damage or destroy itself.  Westchester also moves for summary judgment on the bad faith claim.  Viewing the evidence in the light most favorable to Gerawan and making all reasonable inferences in Gerawan's favor, summary judgment cannot be granted.

With respect to whether there has been a covered loss, the Policy provides coverage for direct physical loss of or damage to Covered Property at the premises . . . caused by or resulting from any covered cause of loss.  A covered cause of loss in the Policy is all risks of direct

1   physical loss unless the loss is [excluded or limited].  The Policy is thus an "all risks" policy.

2   Under an "all risks" policy, the exclusions define the limits of coverage and the insured does not

3   have to prove that the peril proximately causing his loss was covered by the policy.  Gerawan has

4   shown that the nectarines are covered property, since they are stock, and that the nectarines

5   suffered physical damage in the form of pitting.  Gerawan has provided sufficient evidence of a

6   covered loss.  Summary judgment on this ground is inappropriate.

7        With respect to the exclusion for a hidden or latent defect or quality in property that

8   causes it to damage or destroy itself, Westchester's experts and Gerawan's expert disagree as to

9   the cause of the pitting and Westchester's experts are criticized as being too speculative.  While

10  Westchester's experts indicate that weakened lenticels would constitute a latent defect, the

11  evidence indicates that the defect does not cause self-destruction or self-damage.  Rather, it is

12  only when an extraneous or outside force is applied (Gerawan's packing/processing procedures)

13  does pitting occur.  Nectarines that bypassed the process and went directly into cold storage did

14  not pit.  This suggests that the nectarines did not have an inherent quality that brought about their

15  own demise.  Summary judgment on the basis of this exclusion is inappropriate.

16       With respect to the exclusion for growing crops, that exclusion applies to damage done to

17  crops that are unharvested or unsevered from the land.  Here, there is no dispute that pitting is a

18  post-harvest phenomena.  The pitting occurs after harvest and after the nectarines go through

19  Gerawan's packing/processing procedures.  There was no pitting of nectarines while the

20  nectarines were on the trees.  Summary judgment on the basis of this exclusion is inappropriate.

21       With respect to marring, that exclusion is part of a larger exclusion and applies to

22  disfiguring marks or blemishes that occur naturally over time through the reasonable and normal

23  use of an object.  There is no dispute that pitting is a form of blemishing and thus, a form of

24  marring.  However, the evidence also indicates that the 2003 pitting was an "explosion" that far

25  exceeded prior years and was unexpected, which does not suggest normal damage through

26  ordinary use.  Summary judgment on the basis of this exclusion is inappropriate.

27       Finally, with respect to bad faith, that issue is generally a question of fact for the jury.

28  While the general dispute doctrine may shield an insurer from a bad faith claim, it does not

37

relieve the insurer of its duty to thoroughly and fairly investigate, process and evaluate a claim. Further, a claim must be processed without unreasonable delay.  Here, the length of time Westchester took to deny the claim, an apparent violation of California regulations, and the nature of the investigation are all at issue and cast doubt upon the reasonableness of Westchester's conduct.  A reasonable jury could conclude that Westchester acted unreasonably. Summary judgment on this claim is inappropriate.


       Accordingly, IT IS HEREBY ORDERED that:

1.      Defendant Westchester Surplus Lines Insurance's Motion for Summary Judgment is DENIED; and

2.      Defendants Arch Specialty Insurance and Royal Surplus Lines Insurance's Motion for Summary Judgment is DENIED.


IT IS SO ORDERED.

**Dated:   January 4, 2008**             **/s/ Anthony W. Ishii**
                                       UNITED STATES DISTRICT JUDGE